# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DAVID MATHYS,**

**Plaintiff,**

-vs-                                        **Case No.  6:04-cv-1620-Orl-JGG**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

# MEMORANDUM OF DECISION

Plaintiff David Mathys ["Mathys"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Mathys's application for a period of disability, disability insurance benefits and Supplemental Security Income.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

Plaintiff applied for a period of disability, disability insurance benefits (DIB), and Supplemental Security Income (SSI) on March 7, 2002, alleging he became unable to work on February 25, 2002. R. 118-21, 360-63.  The Social Security Administration ("SSA") denied his application at the initial and reconsideration levels, and Mathys timely requested a hearing.

The Honorable Philemina M. Jones, Administrative Law Judge ("ALJ"), held a hearing on June 2, 2004.  R. 29-73.  In addition to Mathys, Dr. Charles Weiss testified as a medical expert and Cynthia Patterson testified as a vocational expert ("VE").  On July 26, 2004, the ALJ issued a hearing decision denying Plaintiff's claims. R. 11-22.  The ALJ concluded that, based on the VE's testimony,

Mathys could perform other work in the national economy and therefore was not disabled.[1]  R. 21, Findings 12 - 13.

Mathys requested review of the ALJ's decision on August 9, 2004, but presented no new evidence to the Appeals Council.  R. 8-10.  On September 3, 2004, the Appeals Council concluded that there was no basis to overturn the ALJ's decision, and denied Mathys's request for review.  R. 5-7.  On November 4, 2004, Mathys timely appealed the final decision to the United States District Court.  Docket No. 1 at 1.  On June 8, 2005, Mathys filed in this Court a memorandum of law in support of his appeal.  Docket No. 20.  On August 8, 2005, the Commissioner filed a memorandum in support of her decision that Mathys was not disabled.  Docket No. 21.  The appeal is ripe for determination.

## II.     THE PARTIES' POSITIONS

Mathys argues generally that the Commissioner erred in finding that Mathys could perform other work in the national economy because the ALJ's findings are not supported by substantial evidence.  Specifically, Mathys argues that 1.) The ALJ's hypothetical to the VE was incomplete because it did not include Mathys's need to lie down; 2.) The ALJ failed to consider Mathys's complaints of pain; and 3.) The ALJ erred in not giving controlling weight to Mathys's treating physician, Dr. Benezette.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ posed a proper hypothetical to the VE. Second, the Commissioner argues that the ALJ did not disregard Mathys's subjective pain complaints and correctly assessed Mathys's credibility. Lastly, the Commissioner argues that the ALJ properly discounted Dr. Benezette's opinions as being inconsistent with other medical evidence and Plaintiff's testimony.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d

835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences.  *Jackson*

*v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence

which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also, Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.      THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, he is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not

have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's

impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him from

doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's

impairments (considering his residual functional capacity, age, education, and past work) prevent him

from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. §

404.1520 (f).

      In determining whether a claimant's physical and mental impairments are sufficiently severe,

the ALJ must consider the combined effect of all of the claimant's impairments, and must consider

any medically severe combination of impairments throughout the disability determination process.

42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not

in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528,

534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ

has considered all alleged impairments, both individually and in combination, and must make specific

and well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987);

*Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe

condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th

Cir. 2001).

      The claimant has the burden of proving the existence of a disability as defined by the Social

Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to

establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where

a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; *Walker*, 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (*e.g.*, medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

-13-

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th

Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See*

*Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054

(11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective

pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon*

*v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352

(11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d

at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit

finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th

Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

## V.   **APPLICATION AND ANALYSIS**

### A.   **THE FACTS**

Mathys was born in 1959, making him 44 years old at the time of the ALJ's decision. R. 33, 118, 360. Mathys testified that he had a ninth grade education, and no subsequent vocational training. R. 34. He had past relevant work as a swimming pool service technician. R. 132, 140. Mathys alleged that he became unable to work on February 25, 2002. R. 118, 360. There is no evidence that Mathys engaged in any substantial gainful activity after his alleged disability onset date.

Mathys sustained on injury while at work on January 18, 1996. Mathys stated he suffered tremendous pain in the right neck and shoulder radiating in the right upper extremity and was experiencing a throbbing and squeezing pain in the right upper extremity. Nevertheless, he did not undergo surgery until approximately one year later. Dr. Larry Schwarz performed a rotator cuff repair surgery on Mathys's right shoulder, which resulted in significant improvement in right shoulder function. R. 316.

At some later point, Mathys saw neurologist Dr. David McDonald for right-sided neck pain radiating in the right upper extremity. Mathys reports that Dr. McDonald ordered an MRI of the

cervical spine, which revealed a bulging of the cervical disc with stenosis.  An EMG and nerve conduction study of the upper extremities revealed carpal tunnel syndrome but no radiculopathy.  R. 316.

On December 21, 2000, after a period of no treatment, Mathys began treatment with Dr. Alyn Benezette, D.O., for headaches.  Mathys reported having daily headaches which originate in the cervical occipital head region and radiate both to the vertex of the head as well as into the right shoulder and upper extremity.  His headaches include photophobia.  There is spasm and pain in the right neck and shoulder and restriction of motion of internal rotation in the right upper extremity when reaching in the back pocket.  An MRI and physical therapy was recommended.  Objectively, Dr. Benezette determined that Mathys showed mild restriction of motion in all planes, moderate spasm, and tenderness to paraspinous muscles of cervical and upper thoracic spine, right greater than left.  Mathys also had active trigger-point tenderness at the level of C4-5 on the right and in the right trapezius muscle.  R. 316 - 19.

On January 25, 2001, Plaintiff returned to Dr. Benezette complaining of sporadic unilateral throbbing headaches predominantly on the right side and occurring in the afternoon after working all day installing pools.  There was restriction of motion in the cervical and thoracic spine with moderate spasm and tenderness to paraspinous muscles of the cervical and upper thoracic spine, right greater than left and active trigger points in the cervical and parascapular musculature.  Strength testing remains 5/5. Dr. Benezette adjusted Mathys's medications and directed him to begin physical therapy. Dr. Benezette also thought Mathys "may benefit" from a more sedentary occupation to allow healing. R. 313 - 14.

-16-

An MRI of the cervical spine dated January 29, 2001, revealed moderate spinal stenosis at C5-C6 and mild spinal stenosis due to posterior osteophytic spurring and C6-C7.  There was no disc protrusion or extrusion.  R. 311- 10.

On February 20, 2001, Dr. Benezette saw Mathys.  Mathys complained of right shoulder pain with limited movement.  He also complained of neck pain with pain radiating to the upper trapezius musculature and posterior arm.  Range of motion of the shoulder was decreased in all movements.  Palpation of the cervical spine demonstrated spasms and tenderness of the upper trapezius musculature as well as the lower paracervical muscles, primarily on the right.  R. 307 - 08.

On March 29, 2001, Plaintiff reported improvement in pain and headaches, having only two headaches that month.  There was decreased tenderness over the levator scapular muscles and rhomboid muscles, but they still appeared to be swollen and tender to touch.  He still had decreased right lateral rotation to approximately 50 degrees.  Mathys's range of motion and his external rotation in abduction had increased since his last visit, and he was now at the neutral position.  R. 300.

On April 18, 2001, Mathys reported having increased pain in the right shoulder, right trapezius and levator scapular muscle tenderness.  The examination revealed definite spasm throughout the levator scapular muscle on the right side with some guarding, tenderness and decreased range of motion but a negative drop arm test.  He received an injection in the affected area.  R. 298.

An MRI of the right shoulder dated April 19, 2001 revealed thickening and increased signal intensity in the supraspinatus tendon.  This was the normal post-operative appearance to a repair, however, residual tendinosis could not be excluded.  No rotator cuff tear was identified.  R. 297.

On  April 25, 2001, Dr. Benezette interpreted the MRI film from six days earlier as showing a torn rotator cuff, although Dr. Benezette noted he had not yet received the official report from the radiologist.  Dr. Benezette referred Mathys to an orthopaedist for evaluation and restricted Mathys to no repetitive movements of the right arm, no overhead, pushing or pulling movements with his right arm.  R. 295.

On May 23, 2001, Plaintiff complained to Dr. Benezette of right shoulder difficulties.  A physical examination showed limited range of motion with decreased strength.  He has a negative drop-arm test within the right shoulder.  Mathys had not yet seen the orthopaedist.  His work restrictions remained the same.  R. 293.

On June 21, 2001, Plaintiff reported to Dr. Benezette that he was having significant pain in the shoulder, and has started to perform most of his duties with the left arm to avoid the right upper extremity.  He had pain with abduction, forward flexion, and internal and external rotation.  He also had a positive impingement test and apprehension test.  Strength was diminished compared to the left side.  Dr. Benezette released Mathys to perform his regular duties, but without use of his right arm. Mathys was again referred to an orthopaedist.  R. 291.

On July 23, 2001, Dr. Benezette's examination of Mathys showed decreased movement within the right shoulder, tenderness over the tuberosity, positive impingement test, positive apprehension test, positive tuberosity tenderness and positive long head of the biceps tenderness.  Otherwise, Mathys was neurologically intact of the upper extremities with sensation, deep tendon reflexes, and strength within normal ranges.  He was once again referred to an orthopaedic surgeon.  R. 288.

-18-

On July 25, 2001, Plaintiff was seen at Halifax Medical Center complaining of ear pain on he right side and pain in the abdomen.  He reported ear pain for the last week and episodes of nausea, vomiting and one episode of diarrhea.  The assessment was right otitis externa and gas.  R. 165 - 66.

On August 22, 2001, Dr. Benezette's examination of Mathys revealed tenderness over the acromioclavicular joint also along the long head of the biceps tendon.  He had a positive impingement test and a positive apprehension test.  Mathys reported that he was tolerating work very well and that physical therapy appears to be helping him quite a bit.   Dr. Benezette again referred Mathys to an orthopaedist.  R. 286.

On October 19, 2001, Plaintiff reported to Dr. Benezette that he continued to have pain in the right shoulder.  Physical therapy was helping him keep the spasm down in the cervical spine, but he was now complaining of a lot of popping and clicking in the right shoulder.  He denied any radicular symptoms in the upper extremities.  The examination revealed a positive O'Brien's test, positive sulcus test of the right side and a positive lock shift test with numbness in the fourth and fifth fingers on the right hand.  He also had positive apprehension test, positive impingement test and decreased abduction and forward flexion.  Dr. Benezette reiterated Mathys's need to see an orthopaedist and thought that Mathys would need to undergo arthroscopic surgery.  R. 283.

On December 7, 2001, Mathys was in an automobile accident.  Mathys saw Dr. Benezette four days later on December 11, 2001.  Mathys reported being hit from behind and experiencing lower back pain with radiation down the right leg to the heel, causing problems with ambulation.  Mathys reported no worsening of symptoms to his neck or shoulders.  Examination of the back showed positive hyperextension test through the notable echmosis with a contusion over the sacral at approximately

-19-

S2 over the left posterior illiac crest.  Spasms over the positive hyperextension in this area shows 20 degrees of full flexion.  There was also positive sciatic notch tenderness, which was severe and positive in the left and right posterior illiac crest tenderness.  The impression was right sided sciatica with acute L5 strain.  Physical therapy and medication were prescribed and x-rays were ordered. R. 279 - 81.

On December 18, 2001, Dr. Benezette observed that Mathys showed profound restriction of motion, particularly to flexion and rotation in the neck with moderate spasm and tenderness.  There were multifocal trigger points, right greater than left.  Dr. Benezette gave Mathys an injection at the affected sites, recommended an MRI of the cervical spine and continued Mathys's light activity restriction. R. 277 - 78.

On December 28, 2001, Plaintiff reported to Dr. Benezette that he was suffering significant increase in neck pain and stiffness and associated spasms.  Mathys reported that his pain was localized predominantly in the cervicothoracic area on the left, and that he noticed some numbness and tingling in the fourth and fifth digit of his left hand.  The examination of the cervical spine showed significant restriction of motion in all planes with moderate spasm and tenderness of paraspinous muscles of the lower cervical and upper thoracic spine at the C7-T1 level on the left.  Strength testing was 5/5 in upper and lower extremities with some decreased pinprick in the fourth and fifth digits of the left hand.  R. 275 - 76.

On January 18, 2002, Plaintiff complained to Dr. Benezette of right sciatic pain radiating down the right leg.  There was tenderness over the right sciatic notch but no other neurological changes. Physical therapy was continued as the area appeared to be improving.  R. 267.  In regards to his

-20-

shoulder, the examination revealed a positive impingement test, positive apprehension test, positive tuberosity tenderness and a positive superspinotous test and positive long of the bicep tenderness. Strength was 5+ with the exception of the actual right shoulder, which had decreased.   Mathys continues on light duty work restrictions. R. 266.

An MRI of the lumbar spine dated January 30, 2002,  revealed mild to moderate disc bulging at T11-12 and L4-5, with an associated radial tear at L4-5.  There was also bilateral mild to moderate neuroforaminal stenosis at L4-5 and L5-S1.  Further there was mild disc bulging at L5-S1.  R. 322 - 23.

Plaintiff returned to Dr. Benezette on February 18, 2002, with complaints of lumbar sciatic symptoms and lumbar radiculopathy to the right.  His shoulder revealed limited external rotation abduction and some tenderness in that position with a positive apprehension test, a positive impingement test and a positive superspinotous test.  Mathys also reported that he stopped taking pain medication and no additional medications were prescribed.  R. 251 - 52.

A few days later on February 25, 2002, Mathys returned to Dr. Benezette complaining of more pain over the past two days when he was unable to move his shoulder.  There was decreased strength and range of motion secondary to pain.  He had extreme tenderness over the tuberosity and acute spasm over the right trapezius muscle secondary to decrease movement of the right shoulder. Dr. Benezette directed Mathys to wear a sling for the next week and to continue with physical therapy. Although Mathys still has not seen an orthopaedist, Dr. Benezette thought Mathys's job was aggravating his shoulder and took Mathys off work.  R. 246.

On March 4, 2002, Mathys reported to Dr. Benezette that he was feeling better but still having a burning sensation. There was limited range of motion with pain along the long head of the biceps tendon and over the tuberosity. He was to remain in a sling and undergo a caudal injection to help with the radicular symptoms of the right lower extremity. R. 243. On March 25, 2002, Plaintiff reported having more pain on the right side of the neck. He was also complaining of pain which radiated to his first and second finger. The examination revealed severe spasm with raising of the levator scapula muscle and scapula on the right side. There was also decreased range of motion of the right shoulder and minimally positive drop arm test. He also showed a positive Phalen's, positive medial nerve compression test on the right wrist and positive Tinel's. An EMG for the bilateral upper extremities was ordered. Physical therapy, pain and anti-inflammatory medications were prescribed. Dr. Benezette ordered Mathys to stay off work for the next three months. R. 230.

Beginning on April 12, 2002, Plaintiff underwent epidural steroid injections under fluoroscopy guidance due to sciatic pain, right lower extremity. R. 172. The procedure was repeated on April 19, 2002. Dr. Malik noted a 15% improvement from the previous injection. R. 171. An electromyography report dated April 15, 2002, notes that Plaintiff did not want to have the examination performed. The median motor on the right side showed slowing through the carpal tunnel region and would possibly be consistent with a carpal tunnel syndrome. An EMG/Nerve conduction study performed on June 21, 1996, was consistent with mild bilateral carpal tunnel syndrome. R. 168.

Dr. Sanapati saw Plaintiff for his third steroid injection on April 29, 2002. Mathys reported sciatica and pain in the lower extremities, right worse than left. He reported very good pain relief in

the lower extremities after the injections, but his back has been hurting severely and the pain in the low back area had not subsided at all.  On examination he had severe tenderness in the right lower lumbar facets at L4-L5, L5-S1 with worse pain on spinal hyperextension and rotation.  R. 170.  On May 13, 2002, Plaintiff stated that his pain had improved by 50% and that he was able to ambulate better and move around.  R. 169.

On May 8, 2002, Dr. Benezette saw Plaintiff.  Mathys's main complaints centered around persistent right shoulder pain and dysfunction.  Mathys reported difficulty with any type of lifting or carrying, reaching, pushing or pulling.  He received relief from some of his low back symptoms after the epidural steroid series.  Examination of the neck revealed mild restriction of motion with mild spasm and tenderness in the paraspinous muscles, cervical and upper thoracic spine, right greater than left.  The impression was right rotator cuff instability with rotator cuff impingement syndrome and lumbar radiculopathy.  Dr. Benezette again recommended Mathys be evaluated by an orthopaedist, prescribed physical therapy and to follow up with Dr. Malik for any additional steroid injections. Mathys was kept off work for one more month.  R. 203 - 04.

James R. Shoemaker, D.O. performed an evaluation on July 16, 2002.  Mathys reported having persistent spasm of the trapezius muscle on the right side and constant numbness of the right lower extremity.  Mathys also reported hyperesthesias of the right lower extremity.  Mathys was observed to be leaning toward the left side when in a standing position and was actually bent forward about 10 - 15 degrees; he was not able to stand up straight.  X-rays of the lumbosacral spine revealed a slight deviation of the lumbar spine starting at L1 through L5 about 5 - 10 degrees toward the right side, otherwise the space in between the vertebral bodies was normal.  The impression was chronic low

back pain per history; moderate to severe lumbar spine spasm of the musculature on the right side; chronic shoulder pain on the right side; history of rotator cuff injury status post repair on the right side; chronic disability of the right shoulder area with an inability to elevate the extremity; possible radiculopathy of the right extremity with chronic numbness of the extremity and chronic hyperesthesias of the right lower extremity.  R. 173 - 75.

Plaintiff returned to Dr. Benezette on August 8, 2002, complaining of continued low back pain radiating into the right lower extremity.  Gait and station were slow.  He was flexed at the waist, having difficulty standing fully erect.  R. 201 - 02.  On October 8, 2002, Mathys reported low back pain that radiated predominantly in the right lower extremity.  Examination of the neck showed restrictions of motion with associated spasm and tenderness in the paraspinous muscles, right greater than left.  There was also moderate restriction of motion of the lumbosacral spine with moderate spasm and tenderness in the paraspinous muscles.  Dr. Benezette prescribed continued physical therapy and medications.  R. 200.

On December 2, 2002, Plaintiff reported having difficulty sitting for more than thirty minutes at a time, standing for more than fifteen minutes at a time, and walking for any length of time.  Mathys was wearing a rigid lumbosacral support with heat which has helped improve his posture and low back pain.  Physical examination showed moderate restriction of motion with moderate spasm and tenderness in the paraspinous muscles, right greater than left.  Dr. Benezette opined that Plaintiff has reached his maximum medical improvement, and is permanently and totally disabled with his low back pain and lumbar radiculopathy and associated right shoulder dysfunction.  From a neurological

standpoint, Dr. Benezette rated Mathys as having a 7% permanent impairment of the body as a whole based on the AMA Guidelines.  R. 198 - 99.

Chiropractor Vincent Proscia saw Mathys on January 3, 2003.  Plaintiff was seen by Vincent Proscia, M.D. for his neck and back complaints.  On manual palpation, moderate to severe muscle spasms were observed.  R. 328.  Mathys treated with Dr. Proscia on January 6, 2003, January 10, 2003, January 13, 2003 and January 15, 2003.  R. 324 - 27.  At the January 15, 2003, visit, Dr. Proscia observed decreased muscle spasm, decreased tenderness and decreased trigger point activity.  Further, active ranges of motion were increased.  R. 324.

Dr. Benezette completed a Medical Source Statement on February 19, 2003.  Dr. Benezette stated Plaintiff could lift 20 pounds occasionally, 10 pounds frequently.  He could stand less than two hours in an eight-hour workday, and sit less than six hours in an eight-hour workday.  He could occasionally kneel, but never climb, balance, crouch or crawl.  Reaching in all directions, including overhead, was limited.  R. 329 - 31.

On March 3, 2003, Dr. Benezette evaluated Plaintiff.  Mathys complained that he still was experiencing predominately low back pain radiating into the right lower extremity and right shoulder dysfunction.  There was moderate restriction of motion and moderate spasm and tenderness in the paraspinous muscles of the lumbosacral spine, right greater than left.  Sensory examination showed decreased pinprick in the C6 dermatome in the right upper extremity and decreased pinprick in the S1 dermatome in the right lower extremity.  His gait and station was slow.  Dr. Benezette modified Mathys's prescriptions and recommended continued chiropractic care and for Mathys to see a neurosurgeon for evaluation.  R. 196 - 97.

Plaintiff was seen at Memorial Hospital on March 22, 2003 with complaints of left ear pain, headaches and pain on the left side of the face. R. 339. On March 31, 2003, Dr. Benezette saw Mathys for low back pain, although Mathys reported that his pain has significantly improved while taking the Durasic patch. The neck showed restriction of motion, as well as spasm and tenderness. Dr. Benezette instructed Mathys to continue wearing his LSO brace for lumbar support and considers him "permanently and totally disabled." R. 354 - 55.

Neurosurgeon Gilbert Tweed, M.D., evaluated Mathys on April 30, 2003. Evaluation of the lumbar spine revealed limited range of motion. The sensory examination showed hypalgesia L5, S1 dermatome, possibly overlapping L4, right more than left. A myelogram and post myelogram CT scan were recommended since Mathys does not have a large HNP to explain his symptoms. R. 356 - 58.

On July 10, 2003, Mathys reported to Dr. Benezette that he was having increased neck and shoulder pain with restriction of motion. Mathys also reported difficulty sitting or driving for any length of time. Restriction of motion, spasm and tenderness were noted during the examination. Dr. Benezette prescribed increased physical therapy and increased the strength of the Durasic patch. Mathys also was referred to another doctor to determine whether interventional pain managmenet would be of benefit. R. 352 - 53.

Mathys returned to see Dr. Benezette on September 2, 2003. Mathys reported that he was able to control most of his pain using the Durasic patches. Mathys also reported that he is able to walk and stand for short periods of time. R. 350 - 51. Mathys returned on December 4, 2003, for a follow-up visit. Mathys again reported that he was able to control his symptoms fairly well with the Durasic patch, although he occasionally has breakthrough pain. The cervical spine showed moderate

-26-

restrictions of motion and moderate spasm.  The lumbrosacral spine showed mild restriction of motion and moderate spasm and tenderness.  Gait and stations was antalgic.  Dr. Benezette continued Mathys's prescription for Durasic patches and prescribed Actiq swabs for breakthrough pain.  R. 348 - 49.

During his February 5, 2004, follow-up visit with Dr. Benezette, Plaintiff reported he was able to control most of his pain with the Durasic patch, describing his pain level of 3/10.  He also stated that he was able to control breakthrough pain with the Actiq swab.  There was otherwise no change in his condition from his prior visit.  R. 346 - 47.

**B.**    **THE ANALYSIS**

Mathys argues generally that the Commissioner erred because the ALJ's hypothetical question to the VE was incomplete because it did not include Mathys's need to lie down.  Additionally, Mathys argues that the ALJ failed to consider Mathys's complaints of pain, and how they affected his ability to work.  Lastly, Mathys argues the Commissioner erred in not giving controlling weight to Mathys's treating physician, Dr. Benezette.

1.    The ALJ's Hypothetical Question to the Vocational Expert was Proper

Plaintiff complains that the ALJ's question to the vocational expert was incomplete because it did not include all of his limitations.  Specifically, Plaintiff complains that the ALJ did not consider his need to lie down during the work day.  Plaintiff's argument is without merit.

The ALJ must pose a hypothetical question to the VE that comprehensively describes the claimant's limitations.  *See Pendley v. Heckler*, 767 F.2d 1561, 1563, (11th Cir. 1985).  However, in determining whether a claimant can perform work, there is no requirement that the ALJ consider

limitations found not credible. The hypothetical question need include only those limitations which are credibly supported by the objective evidence of record. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996); *McSwain v. Bowen*, 814 F.2d 617, 620 n.1 (11th Cir. 1987).

Plaintiff argues that the ALJ "never questioned the VE regarding [his] requirement to lay down." Pl.'s Br. at 11. Plaintiff testified that he has to lay down three times a week for 15 - 30 minutes to relieve his pain. R. 45. In her RFC determination, the ALJ found that Plaintiff required an opportunity to "occasionally" walk around or lie down. R. 18, 21. Having found that limitation as a component of Plaintiff's RFC, the ALJ posed a hypothetical question to the VE that included the limitation having to "occasionally lie down." R. 58. Plaintiff's counsel did not object at the hearing to the ALJ's use of the term "occasionally." The VE, who heard Plaintiff's testimony, responded and named significant numbers of jobs in the national economy that the hypothetical claimant could perform. R. 59-60. The VE further affirmed that her testimony was not inconsistent with information found in the United States Department of Labor's Dictionary of Occupational Titles. R. 58.

Although the VE testified that there would be no jobs for the hypothetical claimant if he was required to lie down for half an hour, three times per week, at unscheduled intervals (R. 66), there is no evidence that Plaintiff had to lie down immediately upon feeling the pain and could not wait for a scheduled break. The medical expert, Dr. Charles Weiss, also testified before the ALJ that Plaintiff's statement that he needed to lie down three times per week would be "on the high side" for most people, but that it was not inconsistent with Plaintiff's medical condition. R. 55. Dr. Weiss, however, did not opine that Plaintiff actually required such an accommodation. Nor is there an entry in any of Plaintiff's medical records that Plaintiff told any of his treating physicians of his need to lie down.

Substantial evidence exists for the ALJ's finding that Mathys needed to lie down "occasionally," and the ALJ did not err in framing her hypothetical question to the VE.

> 2.    The ALJ Properly Considered Plaintiff's Pain Complaints

Plaintiff argues that the ALJ failed to consider Plaintiff's pain complaints and how those complaints affected Plaintiff's ability to perform other work in the national economy.  The ALJ determined that Plaintiff's subjective symptoms were somewhat exaggerated and did not reach a disabling level of severity.  R. 18.  The ALJ's finding was based on the totality of the medical evidence and Dr. Weiss's testimony that Plaintiff's complaints of pain "are on the high side" when considering the types of physical findings.  R. 18.  The ALJ cited numerous references to the record regarding the medical evidence, including, *inter alia*, Plaintiff's admission to Dr. Benezette that he "is able to control most of his pain with a Duragesic patch every 48 hours."  R. 18.  The Court does not find it inconsistent that Plaintiff subsequently told Dr. Benezette that he was experiencing a pain level of 3/10 with the patch.  R. 346-47.  Substantial evidence exists for the ALJ's finding that Plaintiff's subjective symptoms of pain were somewhat exaggerated, and the Court will not disturb the ALJ's finding.

> 3.    Substantial Evidence Supports the ALJ's Decision Not to Accord Controlling Weight to Dr. Benezette's Findings

Dr. Benezette opined that Plaintff could lift twenty pounds occasionally, ten pounds frequently, stand less than two hours in an eight-hour workday and sit less than six hours in an eight-hour workday, occasionally kneel, but not climb, balance, crouch or crawl, and reaching in all directions, including overhead, was limited.  R. 329-31.  The ALJ accorded "lesser weight" to Dr. Benezette's

opinion than it did to Dr. Weiss's opinion.[3]  Dr. Weiss's opinion was accorded greater weight because it was "consistent with the diagnostic and clinical findings and he is an expert in the filed of orthopedics."  R. 18.  Further, the ALJ found Dr. Weiss's assessment was consistent with the State Agency opinion that the claimant is capable of a reduced range of light and sedentary work.  R. 18. Plaintiff argues that the ALJ erred in not giving controlling weight to Dr. Benezette's opinion.

The ALJ must give controlling weight to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527 (d)(2).  The ALJ noted that Dr. Benezette's opinions were inconsistent with his contemporaneous diagnostic and clinical findings of only mild to moderate symptomatology on appropriate medication (see, e.g., R. 346, 348, 350, 352), and were inconsistent with Plaintiff's admission that he was able to control most of his pain with a Duragesic patch and was able to control break through pain with Actiq swabs, and that his average pain level was only three on a ten point scale.  R. 346.  Dr. Benezette's opinions were also inconsistent with his earlier assessment that Plaintiff had a permanent impairment rating of only seven percent (R. 199), and with other substantial evidence, including Dr. Shoemaker's report (R. 173-76), and the examination findings of Dr. Gilbert Tweed (R. 357-58).  Because Dr. Benezette's opinions were inconsistent with his own records,

---

[3] Dr. Weiss opined that Plaintiff retained the residual functional capacity to frequently lift/carry 10 pounds; occasionally lift/carry 20 pounds; reach and grasp with the left upper extremity without restriction and reach and grasp with the right upper extremity only to the shoulder level. He is able to walk for two to fours hours during an 8-hour workday, but may change positions or have periods of rest of five to ten minutes at a time during the two to four period. He is able to sit up to six hours of an 8-hour workday with the ability to rest or change positions every five to 10 minutes. He is able to occasionally walk around or lie down. He may occasionally climb stairs, bend, stoop, kneel, crouch, and crawl, but should not squat or climb scaffolding.  R. 52-53.

substantial evidence supports the ALJ's determination not to give Dr. Benezette's opinion controlling weight.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

**DONE** and **ORDERED** in Orlando, Florida on January 17th, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia       30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL       33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL    32817-9801